3. BEVERLY & BERNARD ZYLSTRA v. DRV Appeal No. 20-1949 We'll begin with Ms. Wells. Good morning. Good morning, Your Honor. Thank you. May it please the Court and Counsel, Elizabeth Wells, on behalf of Beverly and Bernard Zylstra, who purchased a 2016 DRV Mobile Suites Fifth Wheel RV for $90,000, roughly, and continue to make payments on it but can't use it because it's defective. Ms. Wells. Yes, Your Honor. Good morning, or good afternoon. As of the filing of the lawsuit, what items remained unrepaired? Thank you, Your Honor. As of the filing of the lawsuit, the items that remained unrepaired are the door hold not staying open, the gas switch on the range hard to light, the over-the-air antenna showing codes, toilet valve leaks, microwave installed crooked, TV installed crooked, batteries do not hold charge, black holding tank leaks, and there were also additional defects that were discovered at a later date, but they were not aware of those defects at the time of the filing of the lawsuit. And I did misspeak. I said toilet valve leaks. That is not. I was going to ask about that. Which items were subject to repair three or more times, and what were the dates of those repairs? Okay, so the entry door will not lock. That was subject to repair on March 6th of 2017 until April 27th of 2017, and that was when the RV was first awaiting pickup by the Zalstra's. And while you're doing this, do you have page references in the record so we can find these times and dates? They are in my brief, but I do not have them. There were an awful lot I didn't see. Okay, so that's one that had to be repaired three or more times. Yes, and so the second time that that was subject to repair was on the second repair attempt, which was April 29th of 2017 at Phillips RV, and the third repair attempt was on what we called the fourth repair opportunity, which was June 27th of 2017. And the second item that was subject to repair or offered for repair at least three times was the over-the-air antenna showing codes. That was on what we called the second repair opportunity, April 29th of 2017. Wasn't the antenna manufactured by a third party and covered by that third party's warranty? So we outlined this argument in our reply brief, but it's our position that the antenna would still have been covered by the DRV warranty. Just give me a moment. Okay. Okay. So DRV's warranty reveals that it actually covered the repair of the over-the-air antenna under its warranty. That's out. That's out. If it was repaired under its own warranty, it's out of this. Right. Okay, so now we're just with the door lock. I'm sorry. I think I misunderstood you, Your Honor. The records show that DRV repaired it under its own warranty, and I cited that in the reply brief at pages 139 and 146 of the warranty claims, which are Exhibit 8. Okay, so then you're saying the door lock and the air antenna. Yes, Your Honor. And then the last item was the door hold missing screw on overhead compartment. It's basically the overhead compartment. They won't stay closed. So this case is about the door lock, the screw, and the air antenna. No, this case is about 37 different defects which were subject to repair, 234 days, 20 repeated repair defects and defects that were just simply not repaired in a reasonable amount of time. Ms. Wells, can I ask you a question on that statement? Because that's one thing that I had a point of confusion about legally. Has our case law or Indiana case law, perhaps more specifically, explained that the way to approach warranty claims is in that kind of aggregate way that you just summarized? I had always thought that the way to do it was to look at it more component by component, where we were at the beginning of the argument, and then, you know, measure whether the warranty's been adhered to, there were enough opportunities to repair it. But that it's not, you can't state a warranty claim by coming in and saying, well, over the course of time, we've presented 200 items for repair. Right, so under Indiana law, where a warranty fails of its essential purpose, the warranty is breached. So a warranty can fail of its essential purpose for various reasons. Courts have held that a reasonable, if defects are not repaired within a reasonable amount of time, or a reasonable number of attempts, and essentially look at the warranty. What I'm trying to ask is, doesn't that, I think you're right about the standard, but isn't the measure of whether the standard is adhered to more on a component by component basis? As opposed to- I don't think so, because I think that if you're looking at an RV that, for instance, it's taken into the repair shop, and it's there for the full year, full warranty period. Obviously, the purpose of that warranty has not been furthered, because the consumers haven't had use of the RV during the warranty period. But some of those defects, they've only been subject to repair on one occasion. So I think you have to look at the overall vehicle, and maybe the laundry list of defects as well. I think that all of that needs to be considered in determining whether the warranty has failed of its essential purpose. I think you make a point somewhere along the way in your briefs that if evidence showed that a manufacturer held a vehicle to prevent the buyer, the owners, here the Zylstras, from really ever realizing any use of it, that that would certainly be a problem that way. But that's not the fact pattern, right? The fact pattern here is more that there's just been a ton of problems with this particular vehicle, and Mr. Zylstra in particular seems to have been quite diligent in preparing lists and presenting it for the vehicle for repair and the like. I'm sorry. I'm having a hard time hearing you. I heard the end part, but I missed the beginning. My only question is, can you point us to a case in Indiana law or a federal court that analyzes the warranty issues along the lines that you summed up in answering Judge Rovner's question? What's the best case of Indiana law adopting that analytical approach? I think that the court did a good job of analyzing things in the Peg case, and that's a Northern District case. It's cited in the briefs. I think in Simano, the court also made it clear that you don't just look at reasonable number of attempts, you look at time as well. Can I follow up a little bit on that? In particular, I have to say as well, I have a hard time holding the defense accountable for the first 50 days or so before the plaintiffs were ready to pick up the fifth wheel here. But that still leaves your clients without use of this for roughly six months out of the first 10 or 11 that they own the vehicle. What does the evidence tell us about whether the long stays at Plaza, the one in the summer and then the one in the fall of 2017, were necessary for Plaza to get the repairs done versus the Zylstras saying, well, we don't really need this until January, so it's like free storage for us if it's at the dealer. I don't think when the RV was at Plaza they ever gave the impression, and there's no evidence of that, that it was okay for them to have it as long as they like. For the first repair, we're talking about the main time of RVing, the season. It's June to August. Certainly, they wanted to have access to that RV at that time. They're only required under the warranty to present the RV for repair. It's DRV that is required to actually affect those repairs within a reasonable amount of time. Then with regards to the second repair, I think if you look at their October 16th, 2017 letter, when the RV was in the shop at this time, it makes it clear that they weren't okay with the RV sitting there. It's still, although they outlined to DRV the problems that they were having with the RV and the failed repair attempts, the repairs still weren't even performed, and the RV wasn't even returned to them for more than two months after that. Can I ask you to address one particular point in the defense brief? The red brief at page 7 says that as between these two visits to Plaza at the top, the only repeat item was an adjustment to an overhead cabinet door. Apart from that, there were two entirely separate lists. I would have to look that over, but I believe in my reply rebrief, I think I identified one defect that was still there. Let me tell you what troubles me about this case, Ms. Wells. Obviously, we've got the Matthews opinion where we focused on numbers of attempts to repair. I don't think that's the only standard either under Indiana law or under Matthews itself. The time is important, but an awful lot of these repairs are frankly pretty minor stuff. They shouldn't be wrong. They ought to be fixed very easily. The big concern that I have is, and apparently that drove the Zylstras over the edge on this, was the sewage tank leakage. Leaking then into the insulation in the bottom floor, leaving an odor that makes this completely, as you think, unusable for recreational purposes. But it's not clear that DRV ever got a chance to actually try to fix that because of this conversation that Mr. Zylstra had. My question, I guess, is what is the plaintiff's theory? What does your evidence show about that leak? Is it your theory that it was defective, that the tank was defective from the time of the original delivery from the factory, or that it was damaged by Plaza in an attempt to repair, or that it just became a new problem in January on the Texas trip? So according to our expert, Mr. Simmons, he determined that the black valve flange, which is right near where the item that was subject to repair, the flange to the gaskets was cracked. And he determined that that was cracked originally from the manufacturer. So our position would be it was defective at the time it was delivered to Bradley Bourbonnaise at the time the Zylstra's purchased it, and it's still defective and was at the time of Mr. Simmons' inspection. And there was not a correct repair made of the tank when that was presented to Plaza. Correct. And then also when you look at the conversations after Gabriel's maintenance repair, I think that's very important as well, because a warranty,  Here, the representative at DRV said, and this is the only evidence before the court, that he could not guarantee that the repairs would be lasting and that they'd fix the problem. But aren't they entitled to at least one chance? Well, if you can't even guarantee and show that the problem can even be fixed. Oh, you don't know, right? I mean, who knows whether that can be fixed or not. And that would leave the manufacturer in the position of saying, we can't fix it. Here's your money back or we can't. We think we did get it fixed. Why is why aren't they entitled to at least give it a try? I think they did get a try. And I apologize if I gave another impression during the fifth repair opportunity at Plaza RV. There was a report that the holding tank, the black holding tank leaks and that the tank was hard to close. So those, the Plaza RV people did have their hands on it under the warranty. That's the fall visit to Plaza? Yes, Your Honor. That's the one from September 11th until right before Christmas. Okay, thank you. Suppose we were to find that the Zylstras have a warranty claim regarding the black tank valve and a trial began on that issue only. What would the relief be that you would ask for? Payment for the valve or damages for any result of the leaky valve or what? I think it's clear in these types of cases that the measure of damages is the difference at time and place of acceptance between the value of goods accepted and the value they would have been as warranted. So we would seek diminished value damages. Like diminished to zero? So our expert on diminished value has indicated that the diminished value damages would be $69,657.72. Mr. Zylstra, his opinion was yes. It was worth nothing. Okay. Okay, thank you, Ms. Wells. We'll give you a minute on rebuttal, but we will turn to Mr. Gasper. Thank you, Your Honor, and may it please the court. I'll begin there at the black tank because there is no evidence in the record that the black tank was ever submitted to DRV for repair. What the record shows is that the plaintiffs complained that their black tank valve was difficult to close to Plaza RV when they dropped it off in September of 2017. The repair records of Plaza RV, and this is in the record at docket entry 2812, the third page of that repair order, indicate it's an owner issue. As Plaza RV goes through the issues and makes repairs, they designate retail or warranty as between who is responsible for the issue. Plaza RV testified, and their 30B6 deposition is at the record 23-6 at page 100. They testified that the black tank valves can build up residue through an owner's improper flushing, improper washing, or use of an improper product in the black tank. And their repair was to clean that residue and return the RV to the Zillsters. That claim was never presented to DRV as a warranty issue, and there is no evidence of the record to suggest otherwise. But isn't that the wrong burden on summary judgment? I mean, the Zillsters claim that the black tank valves were faulty, and they presented expert evidence that they may have been faulty going back to the date of sale. So, wouldn't that be sufficient? You would still need an opportunity to repair. And the issue identified by plaintiff's expert is a crack in the plastic flange portion of the black tank. And during that expert's deposition, and this is Mr. Simmons, he testified that at the time he inspected the RV, which was well after the black tank leak, that the black tank leak had been fixed. Gabriel's maintenance fixed the issue with the leak. He also noted the crack. And I specifically asked him, do you know the cause of the Zillsters leak? And he said no. The crack issue on the flange is an unrelated part of the black tank valve that didn't result in the leak. And the plaintiffs haven't identified any evidence to suggest that the black tank leak was caused anything other than basically cleaning up the valve is what Gabriel's maintenance record shows. You know, no different than what Plaza RV did, which equally suggests that the plaintiffs continued to improperly use the black tank as it does a defect on the part of DRV. Mr. Gasper, can I ask you a question about something that caught my attention in Mr. Zillstra's declaration that he submitted after his deposition? There's a passage in that declaration where he talks about a conversation that he had with a salesperson at the Bradley Bourbonnet dealership. And that salesperson told him that before the Zillstras picked up the RV, that the dealership used it as a cannibalizing vehicle. That they used it as an RV to go in and grab different parts out of to put in other RVs. I did not see that allegation in the complaint. But my question is, what evidence is there in the discovery record about the RV being used like that before the Zillstras took possession of it from the dealership? I think the affidavit submitted in response to summary judgment is the evidence of it. And ultimately, you know, that type of issue is more of a breach of contract issue between Mr. Zillstra and the dealer, right? If you go to Walmart to buy a bike and the bike you buy doesn't have the water bottle because Walmart put the water bottle from one bike onto another one, you go back to Walmart and you say, hey, you didn't give me the water bottle. Well, maybe. That isn't. So your answer is it's not developed in the evidence. It's not developed in the evidence. The only reason I ask the question is because the warranty does have a workmanship guarantee. And in some hypothetical case where evidence were developed to show that to be true, that a vehicle truly was, as Mr. Zillstra represented, cannibalized, there may well be a workmanship issue. But your point is that it wasn't developed as an evidentiary matter. Correct. And to the extent there were issues and they would have been submitted under warranty, then we could deal with them. But they weren't. The only ‑‑ I misspoke a little bit, Your Honor, because there is one other place in the record where the plaintiffs brought this up, and that is in their letter to Bradley Bourbonnet's RV in October of 2017. And counsel pointed to that letter as an indication that the plaintiffs were somehow unhappy with the amount of time Plaza RV was taken. But within that, they're complaining to Bradley Bourbonnet's about this issue. But it was never presented to DRV to address. So can I follow up on that point, Mr. Gaspard? Yes. If I could just ‑‑ excuse me. Sure. Follow up on this question about the relationship between DRV and these dealers, including those authorized to perform warranty repairs. I was a little surprised to see you disclaiming responsibility for the work of authorized service dealers on warranty work. I understand you don't control them, but you do delegate to them the warranty responsibilities. And does your defense depend upon being able to disclaim responsibility for both Plaza and Bradley, or one of them? No, Your Honor. And really, we're not distancing ourselves from the work. I mean, what we're trying to emphasize in that brief is that we don't control the timing of the work, because there's this kind of overriding ‑‑ look, you're talking here about folks who thought they bought a brand new vehicle. They can't use it during the summer. They can't use it during the fall. They can't use it for about six months, even giving you guys credit for the delayed pickup. It's still six months or so that they can't use it in the first ten or so that they've got it. Yeah, I'd agree that we delegate to them. And I can address the time out of service here. Really, time out of service is a concept we most often see in automobile cases, because it's pretty easy to make two assumptions with an automobile when it's at a shop. One is that it's got a problem. If it's in there for any period of days, it's got a problem that renders it incapable of being used. And two is, if it wasn't at the shop, it would be used. The same assumption can't be made in an RV case, because RVs spend the vast majority of their life not being used, not in service. There's nothing in this record to establish that the plaintiff's RV was actually out of service, that they were going to use it at any particular time but had to cancel a trip. And there's nothing in the record to demonstrate that the issues that they had with the RV that were presented to Plaza RV prevented them from using it. In fact, before they presented it to Plaza RV in June, they went camping with it three different times. I mean, a crooked microwave and a crooked TV doesn't prohibit you from camping in your RV. And so those same kind of basic assumptions we have in a car case, that if it's at the shop, it's out of service, just doesn't fly here. The plaintiff has to present evidence that, you know, one, they were going to use it, and two, that the issues with the RV actually prevented them from using it. And what, you know, as far as the time, in June of 2017, the plaintiffs dropped the RV off at Plaza RV. The guy at Plaza RV, the service manager, says, hey, we're short-staffed. I had a guy who went on vacation suddenly. It is going to be a while before you get the RV. If the Zylsters needed it or wanted to use it, they could have said, hey, we'll bring it back when you can get to it quicker. They could have made arrangements to drop it off for a little bit but pick it up later, which happens all the time in the RV world. They could have said, hey, forget you, we'll find a different dealer. They could have complained to DRV. They didn't. They said, okay. I mean, how many DRV dealers are there in Iowa? Within – I don't know the answer to that question, Your Honor. I would be speculating. And you don't – they were not charged for leaving it there. It was free parking. Correct. And you see that a lot in the RV world. I mean, if someone is not using their RV, they'll drop it off and they'll pick it up at the end of the winter, and they don't care when repairs are being made. It would be like having a bathroom remodel done on your summer home in the middle of winter. If you're not using it, your bathroom isn't out of service. Does DRV concede that there are any items that remain unrepaired? I think – I don't know that we concede that they remain unrepaired,  I think there are complaints that we allege that sufficient opportunity was not given to repair. So what do you think still needs to be repaired? Well, I think at this point the plaintiffs have cleanup that is needed to the insulation in the underbelly and in the – perhaps a replacement of the underbelly to clean up the black tank leak. There may be an adjustment that could be made to the TV to get that straight. The over-the-air antenna, as the court has already kind of gone down, is subject to the manufacturer's warranty. But primarily that's it. And if I may, on time out of service real quick again, in addition to June 2017 acquiescing that it could be a bit before they get their RV back, in September when they dropped it off, they specifically told the dealer, we don't need it until the first of the year. Unlike a car dealership, an RV dealership has the luxury of being able to prioritize their repairs. And there's nothing in the record that suggests that had they told the dealership, hey, we need this back in October, that it couldn't have been done. But when you drop your RV off, you say you don't need it until the first of the year, and then the dealership complies with that and gets it back to you before Christmas, it's tough to then argue that this RV was out of service for that period of time. In the letter that was sent in the middle of those repairs that allegedly shows that they were upset with the time out of service, I think number one, most notably, if they were upset with the time out of service at Plaza, you'd think the letter would have been addressed to Plaza. It wasn't. The letter was addressed to Bradley Burbanis with a copy to DRV, complaining primarily about the issue that Judge Scudder came up or discussed the cannibalization of the unit ahead of the sale and the issue with the damage that the plaintiffs alleged happened at Bradley Burbanis Chevrolet. It did not complain about the length of time that repairs were currently taken at Plaza RV. And, in fact, the record shows that when the plaintiffs did pick up their RV from Plaza RV before Christmas, they actually put it into storage for a period of time before they took it out for their trip at the first of the year. So there might be. Has anybody talked about trying to resolve this by just giving DRV another shot at actually fixing the sewage problems and the effects there? And one more shot at actually fixing these problems that remained unfixed? Yeah, Your Honor, there have been. I don't want to get into too much on the settlement end. But even pre-suit, there were those discussions. Okay. Let me ask you what I asked Ms. Wells. It must be word to find that the Zilchers have a warranty claim regarding the black tank valve, and there's a trial solely on that issue alone. What relief do you think they'd be entitled to if they won? Yeah, if, you know, the black tank valve, again, the record is pretty clear, both the deposition testimony of Zylstra and the expert, that the issue itself is fixed, Your Honor. The issue would be whether or not the cleanup would be covered. And let's assume for our purposes that it would be. You'd be left with damages of that cost of repair, right? And there is no allegation that this issue can't be fixed. Plaintiff's own expert says you have to remove the insulation and perhaps the underbelly and put in new insulation and, you know, fix it. There's nothing in the record to say that can't be done. It would be the cost of repair. It would become an interesting issue because plaintiff's expert aggregated their damages. They said based on everything with this RV, we have a diminished value of, you know, X. And if we were to now only try a single portion of that, whether the plaintiffs might even be able to get that expert testimony and evidence I think would be a question. But we would posit it would be the cost of repair. But, again, we were never presented with that opportunity. And, you know, I asked Mr. Zylstra very clearly and directly in his deposition if DRV at any point in time indicated that they would refuse to fix that issue. And he said no. You know, more or less we have a conversation with a customer service agent where he says, hey, I got this big problem of sewage, and if you guys can't clean it up, it's going to be a problem. And the representative agreed, yeah, that would be a problem. And he asked over the phone, you know, can you guarantee that you can fix it? And very smartly he said, no, I can't guarantee anything. We need to check this out before we can make a determination of what we can do and whether it will hold. You know, this entire case comes down to the Zylstras giving up on an RV and a warranty without giving DRV a chance to resolve it. Well, understand, if I look at this record, it's pretty easy to understand why they might have run out of patients by January of 2018. And I guess the question is whether any of that adds up to a jury issue. Yeah, I understand that, Your Honor. How common, we've seen each other before in arguments, Mr. Gasper, as I recall, and you know this industry very well. How common are these sorts of kind of cascading, multiplying problems with RVs? As far as cascading problems, it is pretty typical. These are hand-built RVs. These are not machine-built. If you were to walk through our assembly facilities, you see each line involve craftsmen, carpenters putting these things together. And so it is pretty common, unlike the automotive industry, that you're going to have warranty claims, right? You have a hand-built product. Just like if you were to build yourself, have yourself a new home built, you know, you walk through the builder, you create a punch list of issues. And after letting the home weather a year, in this case in an RV, after letting the home, you know, drive up and down the road and kind of shake down, you're going to have issues. The amount of issues oftentimes is as dependent upon the eye of the consumer as anything else. But, yeah, you know, nothing about the minor issues, and only one of which was presented multiple times, and that was the overhead cabinet. You know, the issues that were actually presented weren't major-type issues. They were more finished. With my colleague's indulgence, I'd like to just ask, I think, one more question, and that is I'd like to ask you to explain when you think, under Indiana law, a warranty fails of its essential purposes. Yeah, I question the bright-line number. I think under Matthews, we're talking more than two. I know the Indiana Lemon Law for cars, which I would posit are far more important to society than RVs, is four. But I think for purposes of repair attempts, you're looking at at least two repair attempts. We should be given the shot to fix this at least twice before the warranty would fail of its essential purpose. With or without any consideration of total number of problems and time out of service? Yeah, and to Judge Cutter's point, I don't think there are any cases that really aggregate anything. So I think you have to look at individually because, you know, if a plaintiff brings in a DVD player on day one, and then day 90 they bring in a leveling jack issue, and on day 120 they bring in an issue with the overhead compartment, it's difficult to say that, you know, therefore the warranty failed because they had four issues at four different times. How about four different times we come in with 20 issues each time and with some repeats? I mean, my question ultimately winds up being whether that issue about failure of essential purpose, I can imagine situations where you ought to win. But I can also imagine aggregated situations where maybe you shouldn't. Right, and we endeavor that those cases never reach this court because we try to resolve those ones effectively. And Beth and I in particular do a good job of doing that. But, you know, in my view, if you have multiple repair attempts, I'm talking... So you all litigate against each other fairly often. Yeah, you're a team. On some cases, Your Honor, just not on this one. Okay. But no, we both want to do what's in the best interest ultimately of our clients, and that is to get these people back camping and in a good situation. But, you know, if you have a situation where you have three or more repair attempts as any particular issue, you have extensive time out of service that is truly time out of service. You know, if you had a roof leak and it was sitting at the dealership for 120 days, I'd start to look at that and I'd say, man, that might be problematic here, even if there's only one repair attempt. Okay, Mr. Gasper, let's call that the last word. We'll shift back for Ms. Wells. We'll give you a minute since we went over with Mr. Gasper and we'll put this one in the books. Thank you, Your Honor. I'll do my best to get through it quick. A couple of things I wanted to address were, first of all, there was mention by Mr. Gasper that I guess the motor vehicle issues are a little bit more important than RV issues. I disagree with that. So most of these people, including the Zylstras, they're taking their life savings, they're in retirement age, and they are putting that towards something that is very important to them. So I think that in some cases, these defective RV cases are even more significant. With regards to the black tank, there was an argument made that the black tank was never submitted by the dealer to DRV for warranty coverage. But under the warranty, the only obligation that the consumer has is to present it for repair to the authorized dealer. Also, I think it's important to remember that DRVs would not guarantee that they could clean out that sewage issue and fix it. And then the last thing, fundamentally, a warrantor like DRV is required to stand behind its warranty, and a warranty is supposed to get an RV repaired timely within the warranty period. However, if this decision is not reversed and remanded, the duration of warranty repairs will be irrelevant to warranty claims. Consumers will be required to be the intermediary between manufacturers and authorized dealers, despite what the warranty says. And basically, it'll make the warranties somewhat, well, completely worthless. Such a holding would turn warranty law in Indiana on its head and strip RV owners nationwide of their warranty rights. Thank you. Okay, very well. Thanks to both counsel. We'll take the case under advisement.